# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 22-1654V

|  |  |
|---|---|
| AMANDA GRAY, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: December 18, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Mary Novakovic, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On November 7, 2022, Amanda Gray filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") following a flu vaccine she received on September 23, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, I find that Petitioner is entitled compensation, and I award damages in the amount **$63,000.00, for actual pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Relevant Procedural History

Respondent filed his Rule 4(c) Report on November 13, 2023, arguing that Petitioner's "vaccination record clearly documents that she received the flu vaccine in her left deltoid, and not her right deltoid, the site where her subsequent treatment took place." Rule 4(c) Report at 7. I then issued a Scheduling Order noting that Petitioner was likely to prevail on that issue, and instructed the parties to attempt settlement. *See* ECF No. 21. After a short period of negotiation, they reached an impasse. ECF No. 27.

Petitioner filed a Motion for Ruling on the Record ("Mot.") addressing both entitlement and damages. ECF No. 29. Respondent filed a response ("Resp.") on August 19, 2024, in which he raised the issue of severity for the first time. Both entitlement and damages are now ripe for decision.

## II.    Relevant Factual History

Petitioner had no history of right shoulder symptoms prior to the flu vaccine she received on September 23, 2020. Ex. 1 at 3; Ex. 2 at 618-708. The printed vaccine administration record indicates that the vaccination was given in Petitioner's left arm. Ex. 1 at 3. The record also includes a handwritten notation next to "Additional Comments" stating "IM administration" with initials and the date "10-5-22." *Id.*

The following day, Petitioner was seen at employee health for right shoulder pain. Ex. 3 at 12. She reported that she had been vaccinated the previous day "at 7:30am in her R arm," and "immediately had severe pain at the injection site." *Id*. The nurse practitioner recorded that she saw "an 11mm bruise surrounding site of punctate mark at area of acromion process of right shoulder." *Id.* at 13. Petitioner reported no pain at rest, but complained of decreased range of motion and pain (8/10) "deep inside" her shoulder with certain movements. *Id.* at 12. She was diagnosed with a vaccine reaction and possible bursitis, prescribed prednisone and ibuprofen, and placed on light duty for a week. *Id*. at 13.

One week later (September 30, 2020), Petitioner returned to employee health to follow up on her "flu shot reaction in her R arm." Ex. 2 at 572. She reported improvement in range of motion and pain with the prednisone, that worsened to 4/10 after stopping the medication. *Id*.  She was assessed with an adverse vaccine reaction, encouraged to ice her shoulder and take ibuprofen, and placed on continued light duty at work. *Id*. at 573. Petitioner followed up with a phone call on October 21, 2020 reporting that her right shoulder pain had again worsened. *Id*. at 558. She was referred to an orthopedist. *Id*.

Petitioner saw an orthopedist on November 3, 2020 (now six weeks after vaccination). Ex. 3 at 14. She reported a "fairly painful" vaccination that caused symptoms "very very soon thereafter." *Id*. She described "waking up occasionally from sleep due to shoulder pain." *Id*. The exam revealed full range of motion, with mild pain with external rotation, positive impingement testing, and full strength. *Id*. X-rays were normal. *Id*. The orthopedist was "concern[ed] for reactive synovitis secondary to this influenza vaccination." *Id*. She was given home exercises and a cortisone injection. *Id*. at 14-15.

On December 15, 2020, Petitioner had an annual exam with her primary care provider ("PCP"). Ex. 2 at 486. She reported "intermittent trouble with breathlessness" and chest discomfort and "intermittent pain in the bilateral neck and axilla." *Id*. The musculoskeletal exam noted only "no edema." *Id*. The record does not document any right shoulder pain.

Petitioner received Covid-19 vaccines on December 21, 2020, and January 11, 2021. Ex. 2 at 29-30. On January 12, 2021, Petitioner had a fever, muscle pain, and fatigue, and visited a clinic for a Covid-19 test. *Id*. at 436. There is no mention of right shoulder pain.

On January 31, 2021, a rheumatologist provided an electronic consult to Petitioner's PCP regarding her chest discomfort and positive ANA blood test. Ex. 2 at 415-416. He did not see or examine Petitioner. *Id*. at 416.

On February 10, 2021, Petitioner had a consult with a hematology nurse practitioner for pre-operative clearance (due to a known blood clotting disorder) before an outpatient body sculpting procedure. Ex. 2 at 390-393. There is no mention of right shoulder pain in the record.

Petitioner contacted her orthopedist's office on March 9, 2021 (now five and a half months after vaccination). Ex. 2 at 302. She reported "continued right shoulder symptoms" after her flu vaccination which were "progressively worsening." *Id*. An MRI was ordered. *Id*. The MRI (on March 29, 2021) showed a low-grade partial thickness tear of the rotator cuff tendons, and a superior labral tear. *Id*. at 304.

Ms. Gray began physical therapy on April 19, 2021. Ex. 3 at 44. She reported that she received a flu vaccine "when her symptoms began, due to misplacement of the injection." *Id*. She stated that she had a "cortisone injection in November 2020 which gave her some relief for about 2 months," but that her pain had returned. *Id*. She also complained of right upper trapezius pain that radiated up her neck. *Id*. Petitioner had reduced range of motion and reduced strength in her right shoulder and positive impingement testing. *Id*. at 45. Her pain was 3/10 and went up to 6/10 at worst. *Id*. at 44.

Treatment was planned twice a week for six weeks. *Id*. at 46. She completed five sessions through May 13, 2021. *Id*. at 46-52.

Petitioner returned to her orthopedist on June 10, 2021, reporting "significantly improved" right shoulder pain. Ex. 3 at 23. She also noted worsening since she stopped physical therapy, despite her continuing to do her home exercises. *Id*. She had equal range of motion and strength in both shoulders. *Id*. at 24. Petitioner was advised to continue her home exercises. *Id*. at 25.

Petitioner resumed physical therapy on June 18, 2021. Ex. 4 at 40. She reported "that her shoulder pain ha[d] returned some since taking off from PT." *Id*. Her pain was a 2/10 and rose to 4/10 at worst. *Id*. She had slightly reduced range of motion, reduced strength, and positive impingement signs. *Id*. at 41. She completed an additional six sessions through July 16, 2021. *Id*. at 17-37. At her last visit, Petitioner had "seen improvement in strength and pain levels." *Id*. at 17. She transitioned to a home exercise plan. *Id*.

On September 6, 2022, Petitioner saw a pain management specialist for evaluation of her right shoulder pain and a muscle strain in her lower back.[3] Ex. 6 at 10. She reported "persistent right shoulder pain after developing right shoulder synovitis from a miss placed [sic] flu vaccine injection." *Id*. She reported a "constant ache . . . that radiates around the entire shoulder." *Id*. She noted that her first cortisone injection provided significant pain relief for approximately six weeks. *Id*. Petitioner received a second cortisone injection and was referred back to physical therapy. *Id*. at 13-14.

No additional medical records were filed.

## III.    Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

---

[3] Petitioner reported that she strained her back while working out recently on vacation, an injury not connected to her right shoulder pain. Ex. 6 at 11. She was prescribed Zanaflex and diclofenac. *Id*. at 14.

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccine received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Tdap vaccine. 42 C.F.R. § 100.3(a)(II)(C). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Factual Findings Regarding QAI Criteria for Table SIRVA

After a review of the entire record, including the parties' briefs, I find that Petitioner has preponderantly satisfied the QAI requirements for a Table SIRVA. The medical records and affidavits filed in this case are hereby incorporated by reference.

#### 1. *Prior Condition*

The first QAI for a Table SIRVA requires that a petitioner have no history of problems associated with the affected shoulder which were experienced prior to vaccination and would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent does not dispute that Petitioner has met this requirement, and I do not find any evidence that Petitioner had any conditions prior to her vaccination that would explain her post-vaccination shoulder symptoms.

#### 2. *Onset of Pain*

A petitioner alleging a SIRVA claim must also show that she experienced the onset of pain within 48 hours of vaccination. 42 C.F.R. § 100.3(c)(10)(ii). This requirement is also undisputed, and there is record support for it. *See* Ex. 3 at 12, 14; Ex 5 at ¶3.

### 3. Pain and Reduced Range of Motion

The third QAI criterion for a Table SIRVA requires that pain and limited range of motion be limited to the shoulder into which the vaccine was administered. 42 C.F.R. § 100.3(c)(10)(iii). Respondent notes that "the vaccination record clearly documents that [Petitioner] received the flu vaccine in her left deltoid, and not her right deltoid, the site where her subsequent treatment took place." Resp. at 9.

However, there is preponderant evidence in the record that Petitioner likely received the vaccine in her right arm as she alleges, despite the notation on the vaccination record. First, Petitioner reported right shoulder pain from her vaccination the day after vaccination. Ex. 3 at 12. During that first medical visit, Petitioner's provider noted in the record that she saw an "11mm bruise surrounding site of punctate mark at area of acromion process of right shoulder." *Id*. at 13. Second, in every treatment record thereafter, Petitioner consistently reported right shoulder pain associated with vaccination and received all treatment to her right shoulder. *See* e.g., Ex. 2 at 572; Ex. 3 at 14-15 (first visit with orthopedist for right shoulder pain with corticosteroid injection to the right shoulder); Ex. 3 at 303-04 (right shoulder MRI); Ex. 3 at 44-50, 72-101 (physical therapy treatment to the right shoulder). There is not a single record to the contrary. And no other records corroborate left shoulder administration. This Table element is thus also met.

### 4. Other Condition or Abnormality

The final QAI criterion for a Table SIRVA states that "[n]o other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(c)(10)(iv). Respondent does not contest this element. Additionally, I do not find any evidence suggesting that such a condition or abnormality is present here. Thus, I find that Petitioner has satisfied the fourth QAI criterion.

## C. Other Requirements for Entitlement

As stated above, Petitioner has satisfied all requirements for a Table SIRVA and is entitled to a presumption of causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

### 1. Covered Vaccine and Affidavit of No Other Award

The vaccine record shows that Petitioner received a flu vaccine in her left arm on December 20, 2021. Ex. 1 at 3; Section 11(c)(1)(A) (requiring receipt of a covered vaccine). Additionally, Petitioner has stated that she has not filed any civil action or received any compensation for her vaccine-related injury, and there is no evidence to the contrary. Ex. 5 at ¶6; Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied both requirements.

### 2. Severity

To satisfy the statutory severity requirement, Petitioner must demonstrate that her symptoms more likely than not continued until at least March 23, 2021 – six months after the onset of her pain on September 23, 2020 (as Petitioner reported immediate pain after the injection). *See* Ex. 3 at 12. The record establishes that Petitioner began treating her shoulder pain the day after her vaccination and continued through November 3, 2020, when she received a cortisone injection. *See* Ex. 2 at 558, 572; Ex. 3 at 12-15. Petitioner then did not seek shoulder-related care again until March 9, 2021 – approximately four months later. Ex. 3 at 302. Respondent contends that "Petitioner had two large gaps in treatment, one of which occurred during the initial six-month period post-vaccination" and during which Petitioner received treatment for other medical conditions. Resp. at 10.

The filed records in this case provide preponderant evidence that Petitioner's right shoulder symptoms persisted for more than six months, even with apparent intervals with limited or no treatment. In fact, not all such intervals can be properly deemed a "treatment gap." Although Respondent characterizes the time between Petitioner's cortisone injection on November 3, 2020, and when she returned to care on March 9, 2021, as a "treatment gap," this interval can be fairly attributed to the success of Petitioner's cortisone injection, which temporarily alleviated her symptoms. Petitioner returned to care five months and 16 days after vaccination with complaints of "continued right shoulder symptoms s/p influenza vaccination." Ex. 2 at 302. She thereafter continued to treat her symptoms through July 16, 2021, approximately ten months after vaccination.[5] Petitioner has preponderantly established that her symptoms persisted at least that long. *See* Ex. 2 at 304 (MRI done on March 29, 2021, six month and six days after vaccination); Ex. 3 (physical therapy between April 19, 2021 and July 16, 2021).

---

[5] Although Respondent highlights a second gap in treatment between July 16, 2021 and September 6, 2022, that gap does not impact the severity determination. Rather, the second gap will be considered when determining damages.

Respondent highlights the fact that Petitioner had several medical visits during the intervening period during which she did not complain of shoulder pain. Resp. at 10. But these medical visits were not necessarily occasions on which a person would have been expected to report her shoulder pain.[6] *See* Ex. 2 at 29-30 (Covid-19 vaccinations); *id.* at 389 (a hematology consultation to clear Petitioner for an outpatient cosmetic procedure due to a clotting disorder); *id.* at 438 (acute illness and Covid-19 testing). Petitioner also saw her PCP for an annual exam, during which she may have been expected to discuss shoulder pain. Ex. 2 at 486. But Petitioner described two months of relief after her cortisone injection – which would encompass the time of the annual exam. *See* Ex. 3 at 44; Ex. 6 at 10. Thus, Petitioner may not have mentioned the pain due to the relief from the injection.

Respondent finally argues that "the nature of [Petitioner's] right shoulder symptoms changed after the earlier four-month gap," suggesting a new injury or condition thereafter. Resp. at 11-12. Respondent notes that after the gap, Petitioner's complaints involved "neck and upper trap pain" and "new right-shoulder weakness." *Id*. But when Petitioner returned to treatment after the short gap, she consistently related her symptoms to her vaccination. *See* Ex. 2 at 302 ("continued right shoulder symptoms s/p influenza vaccine"); Ex. 3 at 44-45 (her pain from her flu vaccination had returned after her cortisone injection."). Further, although she did complain of pain in new areas during her physical therapy evaluation on April 19, 2021, she continued to have "pain with reaching and overhead activities" and positive impingement testing – all findings she had during her initial orthopedist visit prior to the gap. *Id*. at 14, 44.

Accordingly, I find that severity has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## IV.    Damages

### A.  Legal Standards for Damages Awards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury,

---

[6] One of the visits cited by Respondent was a rheumatology consultation on January 31, 2021. Resp. at 10. That record makes clear that it was a physician-to-physician consult and that the rheumatologist did not see or examine Petitioner. *See* Ex. 2 at 415-416.

and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### B.  Appropriate Compensation for Pain and Suffering

In this case, Petitioner's awareness of her injury is not disputed, leaving only the severity and duration of that injury to be considered. In determining the appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the same record relied upon to determine entitlement. I have also considered prior awards for pain and suffering, in both SPU and non-SPU SIRVA cases, and drawn upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Petitioner only seeks one damages component - an award of $75,000 in pain and suffering, which is based on her argument that she "suffered symptoms for around two

years." Mot. at 9. Respondent contends that Petitioner's symptoms ended after her November 3, 2020 cortisone injection, or at worst, after her physical therapy ceased ten months after vaccination. Resp. at 16. Further, he argues that the "two long treatment gaps" and lack of significant range of motion deficits suggests that a substantially lower award is justified. *Id*. at 18-19. Those factors (along with his view that Petitioner has not established entitlement to compensation) inform Respondent's proposed award of $35,000. *Id*. at 20.

The record establishes that Petitioner treated her shoulder pain almost immediately – the day after her vaccination – and described it as "severe" (8/10) at that time. Ex. 3 at 12-13. She returned for treatment twice more during the first six weeks, receiving a cortisone injection after which she did not return for approximately four months. *See* Ex. 2 at 302, 572; Ex. 3 at 14-15. Then, she had an MRI and did physical therapy through ten months after vaccination. She did not return for further treatment for almost 14 months – and at that time had only one appointment with a pain management specialist. Ex. 6 at 10-14. These facts suggest that Petitioner's symptoms were tolerable for much of her treatment history. During her active treatment, Petitioner's course included a prescription for prednisone, an MRI, two cortisone injections, and 11 physical therapy sessions.

Petitioner cited three cases in her Motion in support of her requested award – all three of which include awards lower that that sought by Petitioner. *See Morgan v. Sec'y of Health & Human Servs.*, No. 20-1286V (Fed. Cl. Spec. Mstr. Sept. 2, 2022); *T.E. v. Sec'y of Health & Human Servs.,* No. 19-0633V, 2021 WL 2935751 (Fed. Cl. Spec. Mstr. May 7, 2021); *Kuhn v. Sec'y of Health & Human Servs.*, No. 18-0091V, 2020 WL 3750994 (Fed. Cl. Spec. Mstr. June 5, 2020). Petitioner argues that she "endured a similar treatment course" as those claimants, but suffered for a longer duration (even though she did not treat for the entire period). Mot. at 9. Of the three cases, *Kuhn* is the most helpful, since it involves a claimant who sought treatment quickly (eight days) after vaccination for substantial pain and had two breaks in treatment. *Kuhn*, 2020 WL 3750994 at *2-3. In total, he had an MRI, five physical therapy sessions, and a cortisone injection (with treatment gaps of six and twenty months) and was awarded $67,500.00. *Id*.

Respondent also cited three prior SIRVA cases in support of his proposed pain and suffering figure– and all three involved awards higher than proposed. *See Merwitz v. Sec'y of Health & Human Servs.*, No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Nov. 14, 2022); *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Spec. Cl. Spec. Mstr. Jan. 4, 2021); *Rayborn v. Sec'y of Health and Human Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020). Respondent argues that "while sharing some similarities," Petitioner did not experience severe pain, did not have severely limited range of motion, and had sizable gaps in

treatment – starting after only six weeks of treatment – and that Petitioner has not proven entitlement. Resp. at 20. Notably, all of the cases cited with Respondent involve claimants who significantly delayed treatment, which Ms. Gray did not.

Also helpful in determining the appropriate award in this case is *Hurley v. Sec'y of Health & Human Servs.*, No. 20-1852V, 2024 WL 1529877 (Fed. Cl. Spec. Mstr. Mar. 4, 2024). That petitioner sought treatment for 8/10 pain in her right shoulder just over a week after her vaccination. *Id.* at *1. She attended 11 sessions of physical therapy during the first two months. *Id.* at *3. She continued to be treated by an orthopedist, received prescription medication and a cortisone injection, and practiced a home exercise plan. *Id.* She continued to follow up for approximately six months (and reported severe pain throughout with little relief) and received $60,000 for her pain and suffering.[7] *Id.* In that case, I noted that the "fact that while [Ms. Hurley] experienced significant pain, she reported no pain at rest" impacted the award. *Id.* at *11. Here, Ms. Gray had a substantially similar treatment course – with 8/10 at the outset, prompt treatment, prescription medication, two cortisone injections, and 11 sessions of physical therapy. Like Ms. Hurley, she reported severe pain with movement, but no pain at rest during her initial visit. Ex. 3 at 12. But while she had a longer treatment duration, the lengthy gaps in treatment suggest that she experienced periods of significant relief. Thus, an award in the range similar to those in *Kuhn* and *Hurley* is justified here.

Accordingly, balancing the severity of Petitioner's SIRVA injury reflected in the record against the arguments presented by both parties and a review of the cited cases, I find that **$63,000.00** for Petitioner's past pain and suffering is reasonable and appropriate in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $63,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[8]

**Therefore, I award Petitioner a lump sum payment of $63,000.00 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt**

---

[7] *Hurley* also included an entitlement decision after Respondent contested both the site of vaccination and the severity requirement. *Hurley*, 2024 WL 1529877 at *7-8.

[8] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

**disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.